Good morning, Your Honors. I'm Donald Caporello of the Nashville Bar. I'd like to reserve three minutes for rebuttal. Your Honors, I represent Brian Eberhard, the relator in this case on a motion to dismiss. So that means on review, all allegations in the complaint are to be treated as true. Mr. Eberhard was an employee of the defendant, a laboratory testing company, and he testified as to the time, place, and content of the alleged False Claims Act allegations in this case. For example, in his complaint, he alleged that in April and May of 2014, over 14,000 testing samples were submitted for payment by the defendant. And he also alleged the principal place of business being the Rock Hill, South Carolina, so he alleged the place as well. And he mentioned that the Vice Presidents, Mr. Kumar and Mr. Campbell, were the ones that caused these claims for payment to be submitted. These and there was the allegation that they certified compliance with all CMS requirements, which includes compliance with the Anti-Kickback Statute. So the manner of representation was also alleged, which is a requirement under the False Claims Act when you're alleging fraud. Here we have false certifications of compliance with the Anti-Kickback Statute. So because you're contending they violate the Anti-Kickback Statute, these payments? Well, the violation of the Anti-Kickback Statute is because they have a sales force that are all independent contractors. And they're paid under a 1099, like all independent contractors. The Anti-Kickback Statute does not allow you to pay independent contractors on a percentage basis because it encourages people to maximize and increase the volume of their claims. And that is exactly the payment situation here. So where exactly in the Anti-Kickback Statute is this prohibition on this commission basis presented? Well, the Anti-Kickback Statute prohibits any type of remuneration that is paid that induces someone to refer patients or testing samples to Medicare and Medicaid. So the key word is remuneration. So when you have a payment system that encourages people or induces people to refer patients or, in this case, testing samples to Medicare or Medicaid on a percentage or a volume basis, the independent contractor is encouraged to increase their referrals. And the federal regulations that I've cited in my brief under the Department of Health say that when you have that type of percentage commission basis, you are not covered by the safe harbor protections. If a person is an employee, they are presumably under enough supervision to avoid this type of volume encouragement because what the federal regulations don't want is a strong financial incentive for people without supervision, like independent contractors, to increase their volume of testing samples, which might include lots of unnecessary tests. And there are numerous cases that talk about this referral situation. When you're inducing referrals for Medicaid and Medicare claims to be made, and there's no question that when you have certifications that are false, requesting claims from Medicare and Medicaid, that's actionable under the False Claims Act. So how could this system be operated in compliance with the Anti-Kickback Statute? If you were people paid who were presenting the samples? They're paid a set amount, like a six-month set amount, like $25,000 or $50,000. That doesn't change based on the volume that they're submitting as opposed to a percentage. Where are these 1099 people getting the supply of the 14,000 cases, for instance? They're given territories of states, and they go and solicit from hospitals and doctors all the testing that they can to be done by their, not their employer, but their principal, PCLS. And then PCLS, in turn, does the tests and submits it to Medicare and Medicaid. So they're given a territory. For example, my client was a member of the sales force as well. He was an employee, and he was given three states, and he has alleged that based on his experience, 50% of the 14,000 per month of the two months that he identified would be submitted to Medicare and Medicaid. And if they have a 1099 sales force paid on a commission basis, they are, we've stated a plausible claim that they're in violation of the anti-kickback statute. So if your client was one of these 1099 people, and if the problem that the district court identified was not having specific examples, why couldn't your client have presented a specific example to wit one of his own situations? Well, he was not a member of the 1099 sales force. He was a member, he was an employee. He was covered by the safe harbor regulations. But he was aware of what the 1099 sales force was doing because he was an insider and a member of the same sales force, but he had a slightly different category. Because he was an employee, he was governed by the safe harbor protections. But the 1099 sales force was not covered by the safe harbor regulations. And he, based on his personal knowledge, has testified that, has alleged that some 28,000 testing samples were done. And based on his experience and personal knowledge in the company, at least 50% of those would have to be submitted to Medicare and Medicaid. The scheme for recovering under this statute, and particularly for fraud, doesn't really encompass or sanction, I would suggest, your particular client. He smells, he thinks, he probably has a very good basis for thinking, but he's not the right person to bring this claim. Because he doesn't have actual knowledge, and because it's fraud, it has to be pled differently. What do you say to that? Well, the allegations have to be taken as true, and he says that based on his experience... That's what he, but you know what he lacks. I mean, you wrote the brief, right? Yes, he lacks an actual claim, he lacks an actual bill or invoice to Medicare and Medicaid with a false certification. He absolutely lacks that, there's no question. But he does, he is entitled to the RELAX standard under 9b, because he does have, well, there's two ways you get the RELAX standard. One way is when you have personal knowledge, and he's a member of the sales force, and we submit that he is the right person, because he is part of the same sales force, he's just part A of the sales force. Part B is the 1099 folks, and he says that he has knowledge that they are submitting the same claims at the same percentages, and that is what gets him there. But the second reason he gets the... But he doesn't have an example. Why not? Well, because that particular, well, to remove that kind of example would be illegal, because you would be taking HIPAA confidential information of testing samples involving people, and you also get the RELAX standard under 9b. Well, you also get the RELAX standard under 9b when the fraud, the details of the fraud is peculiarly, peculiarly, that's a hard word to say, peculiarly in the knowledge of the defendant. And they're going to be the only ones that know, and we're not talking about a fishing expedition, we're talking about two months, two specific months, so we have the time, the place, so we submit that we get the RELAX standard for those two reasons, his personal knowledge, and also because the fraud is peculiarly in the knowledge of the defendant. For him to have pulled out one from somebody else's sales that had a person's name in it would subject him to maybe all kinds of illegal or prosecution for HIPAA-compliant determination. So the reason why the RELAX standard... Can I interrupt to ask? Absolutely. If we were to agree with the two points you just numbered, the personal knowledge along with the information being peculiarly in the hands of the defendant, wouldn't that open the door to any number of relators bringing false claims at claims? To say, look, I know something, I can't tell you, but the defendant has that information. Well, but here we're talking about just two months that we're talking about, and it would only... Well, the trial court relied on the Chesbrough case, and that was dismissed because there was not an insider with personal knowledge, so it wouldn't be any number of relators, it would be only those insiders who have personal knowledge of what's going on in that particular company, and the cases are replete with cases that are being dismissed because people from the outside, like in the Chesbrough case, thought that something was happening, but they didn't have inside knowledge, and that's what makes this case differently. Plus, Chesbrough didn't involve a certification. Here, the only way you get paid by Medicare or Medicaid is if you're in compliance. It's a requirement, a prerequisite that you're in compliance with the anti-CIPEC statute. So we know there had to have been certifications here, plus this circuit recognizes the implied certification theory. Can I ask you this? Do you believe that your client's request for limited discovery cuts against his personal knowledge and his belief that this claim, this scheme, is even backed up by these actual circumstances? Well, he's taken the position, and I take the position, that he's alleged enough to get the relaxed standard to allow him to move forward. The fact that he wants discovery is just an alternative way of trying to get to the same case. He's alleged enough to get to the merits of this case, and he's rebutted the allegation that this is a fishing expedition by saying, here's the fishing hole I want to fish in this one particular, or these two particular months. We want to take one deposition of one person who's going to know if those certifications were, well, if there were thousands of Medicaid and Medicare claims. Why did he limit it to two months? Excuse me? Why did he limit the discovery request to two months? Those are the only two months that he has personal knowledge of as far as the 14,000 plus claims that were submitted. The purpose of the 9b requirement of heightened particularity is not to put all your case on and establish it completely. It's simply to give the defendant enough knowledge about what is being alleged to provide an adequate response. Here they know the months that we claim that they sent false certifications. They know the people who caused it, who's vice presidents. They know the manner in which it's been done. In other words, it's a false claim to the Medicaid. They can look in those two months and they can adequately respond. That's all you need when you have what we have for the relaxed standard to get them and get over the hump. And then, yes, we'd like discovery, but we don't think we need discovery to get a plausible case to survive a motion. But is your claim limited to two months? Does the complaint limit itself to two months at some point or other? Well, the only allegations of false certifications relate to those two months. Now, where in the complaint is it limited to two months? I'll show you, Your Honor. It's paragraph 12. Our examples of 12 and 13 are the two months that we submit alleged. Now, obviously, if we get into the case and find more, then we can allege more. But the reason that this kind of case exists is to keep the federal government from being defrauded. The defendants are the real wrongdoers in this case because they have, we submit, and we've alleged that they've submitted false certifications for thousands and thousands of claims. This is a big company. This could be an enormous wrong to the federal government. So the Minister Eberhardt is a relator. He's a key TAM person. So we have alleged enough, we submit for the federal government. And the federal government here didn't dismiss this case. They have, they're sitting on the sidelines waiting for it to be resolved. So they have not said that this is a bogus case. So we submit that we, the trial court, that this court should reverse the trial court and allow this case to move forward. Thank you, Your Honor. Good morning, Your Honors. I'm Jennifer Weaver of the Nashville Bar. The district court correctly dismissed this complaint for failure to meet this court's well-established, long-standing requirement that False Claims Act complaints plead actual false claims or false certifications. And the court here need only look at the thin and insubstantial evidence that this court pleading that we're dealing with. There's only three pages of factual allegations in this amended complaint, the relator's second and best effort. As the district court noted, and as Mr. Caporella has admitted here, the complaint does not plead specific false claims or false certifications as is required by the Sixth Circuit. So the only issue on appeal is whether Mr. Caporella meets that standard, which this court in Bledsoe and in Marlar and Chesbrough opined may be applied and may be appropriate in circumstances where the relator is unable to plead specific facts or specific false claims, but is able to plead enough detailed facts based on the relator's personal knowledge to create a strong inference that false claims were submitted. The thing that I'm troubled by is if his theory is that all of the 1099 sales reps who are being paid, all of them on a percentage basis, constitute a violation of the anti-kickback statute, why shouldn't his claim go forward? Because it's a generic claim. There's no reason to have to find a specific sales rep who was paid on a percentage basis. He's saying all of them are paid on a percentage basis, and that per se violates the anti-kickback statute. Well, I think that that's a legal conclusion, Your Honor, that allegation that is entitled to no weight. In fact, the anti-kickback statute merely alleging, and this is another area where the complaint in and of itself fails to plead specific, fails to plead falsity with the per se make paying independent contractors on a commission basis a violation. That is not a per se violation of the False Claims Act. What he would have to plead in order to set forth sufficient facts would be that, for example, how much were the independent contractors paid? Give examples of their payment, even of his own payment, and show how that... I think his theory is that if you pay people as salespeople on a commission basis, you're encouraging them to increase their volume, and that that is a violation of the anti-kickback statute. Now, he says it is, and you say it isn't. Where would we go to find out whether that claim constitutes an actual anti-kickback statute violation? We're using this word anti-kickback statute as though there's just one little provision there, but is there some section or some regulation or some case that supports your view? I think you would go to the statute itself and its requirements. Any particular section of it? Number one, the statute itself, and then the supporting regulations that the federal government, that CMS has implemented. What the anti-kickback statute prohibits is paying remuneration to, with the intent, it also has an intent requirement, that to willfully and knowingly induce referrals. Now, significantly in this case, there's no allegation that any illegal remuneration is being paid to anyone in a position to refer federal health care program business, because those persons are health care providers. And so that's one factor that when you're weighing this and when OIG would weigh certain arrangements to see if they're in compliance with the anti-kickback statute, which is in and of itself a fact-intensive inquiry, that's one factor that would weigh in favor of finding that there's no risk of anti-kickback statute violations, because the persons to whom the payments are made are not in a position to refer. There's no allegation here. So if you paid, how would a violation of the anti-kickback statute work in this context of the providing samples to your client? If a doctor at a hospital was paid by your client a percentage of the testing fee, that would be a kickback that would illegal under the anti-kickback statute. I'm just making up an example. Your Honor, that's a far riskier situation where there are payments, and in fact, the independent contractor agreements have requirements of compliance with the anti-kickback statute that there not be any illegal inducements paid to referral sources, who are the providers. The other thing that's missing here, again, and I think it's significant, that there's no specific factual allegations about the payments themselves and whether those payments are in excess of fair market value and were made with the intent to induce referrals, as opposed to compensation for services that these contractors are providing. So again, the anti-kickback statute is a criminal statute. It's the analysis that requires a particular complaint to just say paying a 1099 contractor on a commission basis is a per se violation, and that's all that's in here. And again, three pages of factual allegations. It's insufficient under 9b to state a claim under the anti-kickback statute, much less use that claim to bootstrap that claim into a False Claims Act violation. And I would just say that... Well, it would be a False Claims Act violation if you knowingly violated the anti-kickback statute and you certified that you were in compliance with Medicare and Medicaid rules, right? Yes, if there were factual allegations in this complaint that the defendants knowingly and willfully paid illegal remuneration with the intent of inducing health care providers to federal health care program business, and then they knowingly certified that they were in compliance with the anti-kickback statute, and then submitted claims, then that would be enough. But that would mean... And if you look at what the court said in Chesbrough, and the reason that the court affirmed the district found that that complaint was lacking under 9b is because it required the come up with a plausible False Claims Act violation. And I think that's exactly what the relator is asking this court to do here. He's asking this court to assume that false claims were submitted to the government, although he can't identify any. He asked the court to assume that there were false certifications, although he doesn't identify any. He says that he alleges the content of the claim, but that's not true. There is no allegation in here that describes the content of any statement that PCLS, my client, ever made to the government. What about his argument that he would be violating HIPAA if he gave specific examples here? This happens all the time in False Claims Act cases, Your Honor, that involve health care cases. And you simply submit that under seal. And well, the complaints are filed under seal, but you can redact that information and still provide enough specificity. He wouldn't violate HIPAA by looking into particular files himself, just by looking at them, even though he presented them in a redacted form, hypothetically, in this case. I thought HIPAA prevented people from, like a person working at a hospital, from looking at any patient's file unless that person was directly involved with the care of the patient. Your Honor, I don't know the answer to that off the top of my head in this situation. But at the very least, he could have pled claims based on his own work. But he supposedly is an employee, so he's not being paid on a percentage basis. Precisely. Counselor, it appears to me that the strength of your position relies on his lack of specificity. And I think you can tell me if you disagree with me that the case law, Chesbro being one, allows there to be a strong inference that might arise even if one cannot present, based on personal knowledge, specific examples. And you've heard the argument as to why specific examples were not available, HIPAA being one of them. I'd just like to hear you address why it is you believe that at least there is no strong inference, or perhaps you believe no inference at all, given the lack of specificity. Because this court, again, in the series of cases that we've cited, has recognized the possibility that the 9B standards may be relaxed. It's important to note, this court has never actually relaxed those standards. When facing complaints in Chesbro and Bledsoe and Marlar that were far more detailed than this complaint, they still refused to apply that standard. So it has never been applied by this court, and I would submit this is not the case to do it. And to have, I don't think that the facts that he has pled are sufficient to create a strong inference that false claims were submitted. Again, he asked this court to make a whole series of assumptions about what must have happened or what could have happened or what probably happened, but this court has long held that's insufficient. And so, for example, it's not as though only employees that work in the billing department would be in a position to plead facts based on personal knowledge to create a strong inference. But the only district courts within this circuit who have applied the relaxed standard, and then also in the Hill case that this court cites in Bledsoe, this court cites to an 11th Circuit case, the Hill case, both those cases the relator did in fact work in the billing department, but the key was that they have personal knowledge of billing procedures and the manner in which claims were submitted to the government and the content of those claims, which this relator lacks. Now, Mr. Caperell argued about, well, this is unique. I'm an insider. My client's an insider because he's an employee. Now, in Chesbrough, it was an independent contractor, it was the relator, so he was not an employee. But in the Marlar case in Bledsoe, those were all employees of the defendant. Those were insiders to the same extent that Mr. Eberhardt is an insider. And he simply lacks personal knowledge to make out the type of claim that could withstand scrutiny under 9B under this court's standards. The thing that keeps troubling me is his statement in paragraph 16 of the complaint where he said that compensation of the 1099 representatives was done on a percentage basis and that this is a violation of the Anti-Kickback Act. If that is true, then shouldn't his claim go forward? If it is true that 1099 reps are compensated on a percentage basis and if that violates the federal Anti-Kickback Act, then why shouldn't his claim go forward would be another way to put it. I would say you can, for the purpose of a motion to dismiss, you can assume that he's entitled to the assumption, the factual part of the allegation, that there are 1099 contractors and they are paid on a percentage basis. But he's not entitled to any presumption of correctness with the allegation that that is a violation of the Anti-Kickback Statute. That's a legal conclusion. Okay, so we need to analyze that. Yes, and the Anti-Kickback Statute again is a, and the way that the OIG when looking at different arrangements makes determinations on whether or not something creates a risk of an Anti-Kickback Statute violation, it's a very fact-intensive inquiry. It is not a simple matter of was a payment arrangement, were you paid on a commission basis or not. Supervision is important in that. He says that they're unsupervised, but if you actually, the 1099 contractors are unsupervised, but if you look in the complaint, his factual allegation he added against the Vice President Kumar was that he supervised the 1099 contractors. So he's alleged supervision in his complaint. Fair market value, how much were they paid? Were they paid fair market value? And if so, that can be viewed as compensation for services rendered and he's not entitled to any sort of presumption that that was an illegal inducement for the purpose of inducing referrals from healthcare providers. So it's simply not enough, Your Honor, to say PCLS employed 1099 independent contractors and paid them on a percentage commission basis and therefore it's an Anti-Kickback Statute violation. That's simply not true. Okay, but he does say in paragraph 11 that PCLS pays these independent contractors on a percentage basis to induce them to solicit the referral of samples. So there you're saying that there has to be more specific allegations point by point of individuals? It's because there's an intent requirement not only in the False Claims Act, but there's an even higher intent requirement in the Anti-Kickback Statute upon which he's trying to bootstrap this False Claims Act claim. So he'd have to have further factual allegations about the defendant's intent to induce the referrals, how that was done. And what's really missing here is the payments themselves and some allegation that these payments were in excess of fair market value and the reason that they were is because they were not payments. The analysis you look at is whether they were payments that were fair market value for services rendered or they were in excess of fair market value to such extent that it is indicative of an intent to induce illegal referrals. Thank you. Thank you. Your Honor, attached to the complaint was two sales representation agreements between the defendant and these 1099 salespeople. Luis Sanchez is the one I have right here. The third paragraph says they will be paid a commission of 10% of the actual payment received. So we have a commission situation without doubt. We also have the allegations and the complaints supporting this attachment. And Your Honor asked where do you go to find out that that is a per se violation, simply having a 1099 sales force that is being paid on a commission basis. Well, the Anti-Kickback Statute imposes liability for payment practices that do not fall within the safe harbor regulations. It's on page 8 of my brief. And we cite the U.S. versus Frye case. The Frye case is an example which we think best fits our situation because it didn't involve a billing person, it involved a cardiologist who was, the referral inducement there was the cardiologist was one of several cardiologists and they were being, getting limited time on the, at a certain room, the operating room in the hospital based upon how many cases they referred. And that created an inducement to get more time because that's how they made money. And the court relaxed the standard in that situation because he didn't have specific knowledge of a particular claim to Medicare even though he knew that it was going forward. So here, although I don't think it's limited to a billing person like in the Lane and versus Hill case, I think our case is more like that than the Chesbrough case. You have the U.S. versus Frye case. But beyond that, you have the specific regulations which say that there are many examples of abusive practices by sales personnel who are paid as independent contractors and who are not under appropriate supervision. And the court and the regs specifically say the reason that we're not going to allow safe harbor protections to embrace these commission-based independent contractors is because they're just, we're not going to make them exempt from civil or criminal prosecution of anti-kickback statute because they don't have appropriate supervision in most situations and it creates an extreme likelihood that they're going to maximize the amount of services they're referring to Medicare and Medicaid. So we submit, Your Honor, that in paragraph 16, as you pointed out, there is a per se violation from a plausibility standpoint that is alleged that having a 1099 sales force, and we've also cited some background information articles that talk about how this is a really big problem. But about your opponent's argument that in paragraph 11, for instance, you say that this was done to induce the soliciting of referral of samples, but you don't have any specific allegations that support that. Well, to address a different question, to answer that question, it would be a HIPAA violation for an employee of the defendant to go and look at somebody else's report involving somebody else's personal information. I can't look at it. I have to get releases in all the cases I work at in order to get a look at anybody's personal health information. So you can't just submit a redacted form, because you would have looked at it in order to redact it. So that's why he doesn't have the specifics. And the Fry case, the Hill case, and the Lane case are the three cases plus the regs that give the court what it needs to know that we've stated a plausible claim, because they have a 1099 sales force that is paid on a commission basis, and that creates volume billing. But do you need to have specific allegations showing the inducement, that the purpose was to induce soliciting? I think the allegation by itself that the purpose is to induce, and after all, there's case law that says only one purpose of the payment structure needs to be an inducement. And the Fry case talks about that and answers the question very specifically as to how an inducement, it's enough of an inducement if it makes human sense that somebody's going to increase the volume of what they're doing if they're paid on a percentage basis. Thank you. Thank you, Your Honor. Thank you both for your argument. The case will be submitted. Would the clerk call the next case, please?